2009 VT 59

# City of Burlington v. Fairpoint Communications, Inc.

[980 A.2d 226]

No. 08-019

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed May 29, 2009

Motion for Reargument Denied August 19, 2009

*Kenneth A. Schatz*, City Attorney, and *Brian P. Monaghan* of *McNeil, Leddy & Sheahan, P.C.*, Burlington, for Plaintiff-Appellee.

*Peter H. Zamore* and *Debra L. Bouffard* of *Sheehey Furlong & Behm P.C.*, Burlington, and *Richard P. Owens*, Verizon Legal Department, Boston, Massachusetts, for Defendant-Appellant.

*Sarah Hofmann*, Director for Public Advocacy, Montpelier, for Amicus Curiae Vermont Department of Public Service.

*Kenneth C. Picton*, Assistant General Counsel, Rutland, for Amicus Curiae Central Vermont Public Service Corporation, and *Donald J. Rendall, Jr.*, General Counsel, Colchester, for Amicus Curiae Green Mountain Power Corporation.

*Robert F. O'Neill* and *Norman Williams* of *Gravel and Shea*, Burlington, for Amicus Curiae Comcast, LLC.

¶ 1. **Reiber, C.J.** The Telephone Operating Company of Vermont, LLC,[1] appeals from the superior court's order granting summary judgment to the City of Burlington in this cost-allocation dispute. We hold that the city charter and an ordinance enacted pursuant to the charter gave the City the power to impose relocation costs on the utility, and therefore affirm.

¶ 2. The pertinent facts were set out in a joint statement of stipulated facts. The City, beginning in 2004 and 2005, undertook roadway reconstruction projects on North Street and Riverside Avenue. North Street is a "Neighborhood Activity Center" as defined in the City's Municipal Development Plan, and Riverside Avenue is a main approach to the City. The projects entailed "substantial construction." The projects included resurfacing road-ways; narrowing the roadway on North Street; constructing new curbs, sidewalks, and bike paths; adding traffic signals and decorative light fixtures; and "undergrounding" utility wires and other fixtures.[2] Although the projects included undergrounding utility fixtures, the projects also resulted in some new aboveground fixtures, principally new decorative light poles. The

---

[1] When the litigation began, the real party in interest was Verizon New England, Inc.

[2] The trial court rejected the verb "to underground" as jargon, but the term is in common usage in the utility industry and imparts greater meaning in that context than the more common verb "to bury." Thus, we use the various forms of "to underground" in this opinion.

City stated that it undertook the projects to improve the City's transportation network; improve public safety for pedestrians, cyclists, and motorists; improve visual quality; and stimulate commercial development.

¶ 3. From the beginning, the parties have disputed which of them should bear the cost of undergrounding. Accordingly, before construction began, they agreed to submit the cost-sharing question to the courts for resolution. That agreement also provides that the Vermont Agency of Transportation will pay 50% of the incremental cost of undergrounding — that is, 50% of the amount by which the cost of undergrounding exceeds the cost of aerial relocation — and that the parties dispute which of them is responsible for the remaining 50% of the incremental cost. The amount in dispute is approximately $400,000.[3] The projects have now been completed, and the utility is currently providing service via the underground facilities.

¶ 4. The City, pursuant to the agreement, sought a declaratory ruling in the Chittenden Superior Court that the utility was obligated to pay the incremental undergrounding costs. After stipulating to the facts detailed above, both parties moved for summary judgment. The utility contended that it had a statutory right to place its utility facilities along streets "as long as they don't interfere with travel or repairs," and that the highway relocation statutes required the City to pay the disputed incremental relocation costs. The utility further argued that the City was precluded, by a 1985 settlement agreement, from recovering the disputed costs from the utility. The City contended that the utility's rights to maintain facilities in the City's streets were limited by the terms of the city charter and by our holding in *Vermont Gas Systems, Inc. v. City of Burlington*, 153 Vt. 210, 571 A.2d 45 (1989). The trial court agreed with the City and granted summary judgment in its favor, relying principally on *Vermont Gas Systems*.

¶ 5. We apply the same standard as the trial court when evaluating motions for summary judgment. *Bixler v. Bullard*, 172 Vt. 53, 57, 769 A.2d 690, 694 (2001). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

---

[3] The parties "expect that they will be able to determine the actual costs in the usual course of business" and without the assistance of the courts.

any, . . . show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." V.R.C.P. 56(c)(3). When both parties move for summary judgment, each is entitled to the benefit of all reasonable doubts and inferences when the opposing party's motion is being judged. *Toys, Inc. v. F.M. Burlington Co.*, 155 Vt. 44, 48, 582 A.2d 123, 125 (1990). Here, as noted, the trial court granted summary judgment to the City, and thus, in evaluating the decision below we will construe all reasonable doubts and inferences in favor of the utility. Even viewed in that skeptical light, we find no basis to reverse.

¶ 6. The utility first claims that the trial court erred in concluding that 30 V.S.A. § 2502 did not bar the City from requiring the utility to underground its facilities at its own expense. The utility reads the section as announcing a broad "legislative determination that the right of utilities to provide service through facilities within the public right-of-way is subordinate *only* to the state's interest in facilitating public travel and highway maintenance." Put another way, the utility contends that its right to place its facilities aboveground in the public way is *not* subordinate to the City's interest in promoting economic development or aesthetic values. According to the utility, the City may order it to pay for undergrounding only if its aboveground facilities pose a danger to residents or an impediment to travel.

¶ 7. For the reasons set forth in the ensuing discussion, we conclude that the right imparted by § 2502, whatever precisely it may be, is trumped by the city charter. The statute provides, in full, as follows:

> Lines of telegraph, telephone and electric wires, as well as two-way wireless telecommunications facilities, may, subject to the provisions of [19 V.S.A. § 1111], be constructed and maintained by a person or corporation upon or under a highway, in such manner as not to interfere with repairs of such highway or the public convenience in traveling upon or using the same.

30 V.S.A. § 2502 (2000).[4] The statute's import must be assessed in light of the city charter and ordinances, 24 V.S.A. § 2291(6), and our holding in *Vermont Gas Systems*, 153 Vt. 210, 571 A.2d 45.

---

[4] The statute was amended in 2007 to include "broadband facilities," but that amendment is not pertinent here. See 2007, No. 79, § 9, effective June 9, 2007.

¶ 8. The trial court concluded that *Vermont Gas Systems* largely controlled the outcome of the summary judgment motion, and cited that case for the proposition that Vermont cities and towns have "considerable authority over the location of utility fixtures in, under or above municipal streets and sidewalks." In the course of its discussion of *Vermont Gas Systems*, the trial court dismissed the utility's contention that the undergrounding here served merely aesthetic purposes, presuming instead that the City very likely had more pragmatic concerns in mind. The court noted that there was "nothing in the record . . . suggesting that the decision to bury lines was delegated to some assemblage of aesthetes who made their judgment free of any of the various considerations which might otherwise come quickly to mind." Rather, the court determined, "[t]he law should instead assume that political decisions were made on more pedestrian considerations." This perspective, however, was arguably contrary to the stipulated facts. As noted, the stipulated facts did not clearly establish whether the undergrounding was meant to promote safety, aesthetics, economic development, or some combination of the three. The stipulation, instead, recited that "[t]he City states that the Projects are intended to improve the City's transportation network, improve public safety for pedestrians, cyclists and motorists, improve visual quality and stimulate commercial development activity."

¶ 9. Although the trial court's comment concerning the City's nonaesthetic motivation for the projects was not supported by the stipulated facts, it does not compel us to reverse, because the applicable city ordinance plainly requires the utility to pay for the undergrounding, *regardless* of its purpose. Any error the trial court committed by indulging in presumptions about the City's motivations was therefore harmless. See *Progressive Ins. Co. v. Wasoka*, 2005 VT 76, ¶ 20, 178 Vt. 337, 885 A.2d 1166; see also V.R.C.P. 61.

¶ 10. The City was empowered by the municipal charter to require the utility to pay for the undergrounding. The charter allows the city

> [t]o fix, demand, impose and enforce such terms, conditions and regulations for the use or occupation of any street or highway in said city by any street railroad, traction, telegraph, telephone, electric, gas, electric lighting, electric power, or other company or any person

enjoying the privileges, or exercising the functions of any such company aforesaid, as shall be just and reasonable, including any sum or sums of money to be paid to said city for the use of any street or highway by any or all of said companies for the purpose . . . of therein erecting and maintaining any poles, wires or any other apparatus . . . and to prohibit the use of such street by any such company or person until such terms have been complied with.

24A V.S.A. Ch. 3, § 48(40)(A) (charter of the City of Burlington). The charter is a special local law enacted by the Legislature to have effect only within the borders of the municipality it governs. The Burlington charter was enacted in 1949, with § 48(40) — then denominated § 48(XL) — in its present form. See 1949, No. 298, § 48. Based on the authority of the charter, the City enacted Burlington City Ordinance § 27-126(c)(5), which provides as follows:

*Cost.* In the case of any public improvement project or substantial roadway reconstruction where the placement of utility facilities underground is to be done for aesthetic or economic development purposes, the person initiating the project shall be responsible for securing the difference in cost between the placement of utility facilities above ground and their placement underground. The affected utilities shall be responsible for the costs if placement underground is being done in the best interest of service delivery. *When the City of Burlington initiates a substantial roadway reconstruction for any purpose, the affected utilities shall be responsible for the underground relocation cost.* (Emphasis added.)

The trial court did not cite the above-emphasized language, but we conclude that it is controlling and requires us to affirm. See *Larkin v. City of Burlington,* 172 Vt. 566, 568, 772 A.2d 553, 556 (2001) (mem.) (this Court may affirm for any reason supported by the record).

■ ¶ 11. Whether the charter or a generally applicable state statute controls is a matter of statutory construction. *Town of Brattleboro v. Garfield,* 2006 VT 56, ¶ 10, 180 Vt. 90, 904 A.2d 1157. "[W]here two statutes cover the same subject and one is

more specific than the other, we harmonize them by giving effect to the more specific provision according to its terms." *Our Lady of Ephesus House of Prayer, Inc. v. Town of Jamaica*, 2005 VT 16, ¶ 16, 178 Vt. 35, 869 A.2d 145 (quotation omitted). In *Garfield*, we concluded that a charter would be given effect because it was "more specific to the Town of Brattleboro" than the generally applicable state statute there at issue. 2006 VT 56, ¶ 10.

¶ 12. Section 48(40)(A) is more specific to the City of Burlington than 30 V.S.A. § 2502 or 19 V.S.A. §§ 1601-1606, which we consider in turn below. The charter section explicitly empowers the City to impose charges on utility companies for the use of city streets and to prohibit the use of the streets by companies who do not pay such "just and reasonable" fees as the City has imposed. Burlington's charter provision, and others like it, create a pragmatic limit on other, more general, statutory rights.

¶ 13. Section 2502 simply permits specified utilities to place their facilities "upon or under a highway, in such manner as not to interfere with repairs of such highway or the public convenience in traveling." That is, the section gives utilities a right — which may also be limited in other ways that we need not explore today — to locate their transmission facilities *either* aboveground or below, provided that those facilities do not interfere with repairs or travel. The statute is silent as to whether, or under what conditions, a municipality can order preexisting facilities moved to another location that also does not interfere with repairs or travel. The statute is equally silent as to who shall bear the costs of relocation.[5] Indeed, the statute does not explicitly prohibit municipalities from charging utilities a fee for placing facilities *aboveground.*

¶ 14. By contrast, the city charter, quoted above, endows the City with very specific powers over the location of utility facilities on and under its streets, including the power to charge "just and reasonable" sums for "the purpose . . . of therein erecting and maintaining any poles, wires or any other apparatus in or under the surface of said street." Charter § 48(40). If any fees imposed under the authority of the charter are not paid, the charter gives

---

[5] The utility concedes that it would be required to pay for the cost of relocation to any other aboveground location, and offers no principled reason that it can be made to pay for any and all aboveground relocation, but not for any underground relocation.

the City the power to "prohibit the use of such street by any such company or person until such terms have been complied with." *Id.* We are unconvinced by the utility's argument that § 2502 is more specific than the charter. The utility bases this argument on the contention that § 2502 "prescribes a specific standard governing the location of facilities (no interference with repairs or travel), whereas the Charter and [§] 2291(6) are based on the far more general 'just and reasonable' and 'public health, safety, welfare and convenience' standards[,] respectively." And the city ordinance, which requires utilities to bear the cost of underground relocation when the City "initiates a substantial roadway reconstruction for any purpose," is plainly within the authority the Legislature granted by enacting the charter.

¶ 15. Although our holding in *Vermont Gas Systems*, 153 Vt. at 216, 571 A.2d at 49, affirming the imposition of gas-main-relocation costs on a utility company, does not directly govern the outcome today, the considerations underlying that decision are nonetheless instructive. In that case, we held that a municipal franchisee, by utilizing a public right-of-way for a gas main, had "accept[ed] the risk that it may be required to change its location at its own expense as the public convenience or security requires." *Id.* *Vermont Gas Systems*, like the city charter provision noted above, merely suggests that there are pragmatic limits on the right announced in § 2502.

¶ 16. Nor is our holding in *Rutland Cable T.V., Inc. v. City of Rutland*, 122 Vt. 162, 166 A.2d 191 (1960), to the contrary. There, a cable television provider sought a writ of mandamus to compel the city council to consider the merits of its application for a permit to construct cable television facilities. The city council had previously purported to grant, to another provider, an exclusive franchise. The council had thus denied Rutland Cable T.V.'s application out of hand. We noted that "we cannot escape the conclusion that the city council has refused to determine the petitioner's application on its merits and has unlawfully declined to prescribe where and in what manner the wire shall be constructed." *Id.* at 167, 166 A.2d at 195. We issued a writ of mandamus, "directing [the city council] to examine further into the petitioner's application to determine whether the project proposed . . . will interfere with the public travel or convenience in use of the streets of the city of Rutland." *Id.* at 168, 166 A.2d at 195. "If it be determined," we went on, "that the proposed

construction is inconvenient or inexpedient, the [city council] shall determine where and in what manner such wires shall be erected . . . ." *Id.*

¶ 17. *Rutland Cable T.V.* did not deal squarely with the question we confront today. Nor does it stand for so broad a proposition as the utility assigns to it. Rather, *Rutland Cable T.V.* held that a city council may not, without running afoul of § 2502, *arbitrarily* deny a permit to one utility for activities it has already allowed another utility to do. As the opinion makes clear, however, a municipality may "determine where and in what manner" transmission facilities may be built or maintained under § 2502. *Id.* That holding does not foreclose the City's actions here.

¶ 18. The utility also premises a claim of error on the theory that 19 V.S.A. §§ 1601-1606 require the City to pay for the undergrounding. The sections were enacted in 1995, see 1995, No. 60, § 25, eff. April 25, 1995, and generally govern "Utility Relocations in Connection With Certain Highway Projects." Their purpose "is to set standards for determining when and to what extent the authority granted by section 1603 of this title may be exercised." 19 V.S.A. § 1601. Section 1603, in turn, provides that municipalities "may pay for some or all of the cost of [utility] relocation." *Id.* § 1603. Where certain eligibility criteria are met, see *id.* § 1605, "the differential costs over and above normal relocation cost shall be apportioned on a 50/50 basis between the agency and the municipality," *id.* § 1606(b). The utility claims that the statute requires the City to pay its 50% share of the differential costs without seeking contribution from the utility. But the statute is silent as to the permissible sources of city funds. In light of the charter's express grant of authority to the City to charge "just and reasonable" sums for "the purpose of . . . erecting and maintaining any poles, wires or any other apparatus in or under the surface" of city streets, Charter § 48(40), we do not read chapter 16 as prohibiting the City from requiring a utility to pay the City's statutory share of the differential costs.

¶ 19. Finally, the utility contends that even if the City had the power to order undergrounding at the utility's expense under the charter, ordinances, and statutes, the City signed that power away in a 1985 agreement settling a dispute over excavation fees. We disagree. The trial court correctly concluded that the 1985 agreement was meant to settle one particular dispute, which

apparently concerned the question of whether the City could charge the utility for the right to excavate city streets to install its facilities, and not to prevent the City from imposing any undergrounding-related costs on the utility until 2014. Rather, as the agreement's plain language reflects, it was intended to impose on New England Telephone and its successors a fixed sum per year, in exchange for which the City would "assist the Utility in the expeditious completion of its future excavations," and would not charge the utility any fee for the right to perform those excavations. The agreement, as the trial court concluded, does not bar the City from imposing on the utility the cost of relocating lines underground.

■ ¶ 20. The City has the power to impose undergrounding costs on the utility under a valid ordinance enacted pursuant to the charter. The charter, which is the most specific legislative enactment governing the question, will be given effect, along with the ordinance promulgated pursuant to the charter. *Our Lady of Ephesus*, 2005 VT 16, ¶ 16 (where two enactments may govern the same activity, Court harmonizes them by giving effect to the more specific one according to its terms). The statutory provisions upon which the utility relies are less specific and, to the extent they can be read as conflicting with the charter, must yield to it.

*Affirmed.*