STATE OF VERMONT

**SUPERIOR COURT**                                                    **ENVIRONMENTAL DIVISION**
                                                                     Docket No. 200-10-09 Vtec

**In re Champlain Oil Co., Inc. Conditional Use Application**

**Decision on Cross-Motions for Partial Summary Judgment**

This matter involves the efforts of B. Cairns Property, LLC, d/b/a Champlain Oil Co., Inc. ("Applicant") to secure approval to construct and operate a gasoline station, retail store, and fast-food restaurant on property located on the easterly side of Vermont Route 7 in the Town of Ferrisburgh ("Town"). The 9.04-acre project site is a split lot partially located in three zoning districts: the Highway Commercial District ("HC District"), the Rural Agricultural District ("RA District"), and the Conservation District. The Town of Ferrisburgh Zoning Board of Adjustment ("ZBA") granted Applicant a conditional use permit for the project, with fourteen conditions, and Applicant has appealed the imposition of permit conditions 1–4 and 6–9. A group of fifteen individuals, as well as Ferrisburgh Friends of Responsible Growth, Inc., (collectively, "Opponents") filed a cross appeal of the ZBA's decision, raising a number of issues concerning the proposal's compliance with the Town of Ferrisburgh Zoning By-Laws ("Bylaws").

Applicant is represented by Liam L. Murphy, Esq.; Opponents are represented by James A. Dumont, Esq.; the Town, which has entered an appearance in this matter, is represented by James F. Carroll, Esq.

The principal parties have each filed a motion for partial summary judgment, seeking a summary ruling in their favor on three distinct legal issues: (1) whether the proposed retail store is a permissible use in the HC District; (2) whether the fast-food restaurant may include the proposed drive-up service window; and (3) whether the wastewater and stormwater systems may be located partially within the Conservation District. The Town has chosen not to play an active role in this pretrial motion practice; the pending cross-motions are now ripe for review.

**Factual Background**

For the sole purpose of putting the pending motions into context, we recite the following facts, which we understand to be undisputed unless otherwise noted:

1

1. The project site is to be a 9.04-acre parcel of land on the easterly side of Route 7, about one-tenth of a mile north of Little Otter Creek, in Ferrisburgh. The proposed site is the approximate location of the former Roadhouse Restaurant, recently destroyed by fire.

2. Applicant does not yet own the project site; in fact, the precise 9.04-acre parcel has not yet been created.[1] The proposed site is comprised of a 2.5-acre parcel currently owned by Marcos and Claudia Llona, as well as 6.54 acres of an adjacent 24.27-acre parcel owned by Susan Burdick. In order to create the project site, Ms. Burdick will convey 6.54 acres of her lot to the Llonas, effectively readjusting the boundary between the two properties. Once all permits are issued, the Llonas will convey the newly created 9.04-acre parcel to Applicant.

3. The resulting 9.04-acre project site would span three zoning districts. The majority of the lot, which fronts Route 7, would be within the HC District; the back portion of the lot would be split between the RA District and the Conservation District.[2] Applicant's proposal involves development in all three zoning districts.

4. Applicant submitted a conditional use permit application on April 30, 2009, and on May 14, the application was resubmitted, without change, on the proper application forms. Applicant seeks approval to construct and operate a gasoline station, a retail store, and a fast-food restaurant on the project site; the new construction would include two fueling dispenser islands and one multi-use building.

5. The proposed 4,800-square-foot building would be located entirely within the HC District; approximately half of the building would be used as a retail store and half would contain a fast-food restaurant.

---

[1] The only application before us requests conditional use approval for the proposed project. Applicant refers in various filings to the "creation" of the new 9.04-acre lot upon which its development is proposed as a "lot line adjustment." We are uncertain from the record before us whether Applicant's proposal will require subdivision approval. See Bylaws § 5.25 (stating that "no lot shall be so reduced in area . . . [such that the lot] do[es] not conform to the requirements herein prescribed"); see also Bylaws § 2.2 ("Boundary Adjustment" is "[a] division of land for the purpose of adjusting boundaries between adjacent lots or parcels where no new lot is created. A boundary adjustment shall not create a nonconforming use or lot." (emphasis added)). But we need not resolve that issue in this proceeding because Applicant does not seek subdivision approval by the pending application.

Nevertheless, we note that a 6.54-acre portion of the Burdicks' property will be carved off and conveyed to the Llonas, thereby creating two new lots: a 9.04-acre parcel that will ultimately be conveyed to Applicant, and a 17.73-acre parcel that will be retained by the Burdicks. Each of these two new lots will span all three zoning districts.

[2] The Llonas' existing 2.5-acre parcel is a split lot, the front of which is located in the HC District and the rear of which is located within the RA District. The 6.54-acre portion of the Burdick lot spans three zoning districts: the portion fronting Route 7 is in the HC District, but the back portion of the lot is divided between the Conservation District and the RA District.

6.      The retail store, which Applicant often characterizes in its application materials as a "convenience store," would occupy 2,600 square feet and would serve a number of purposes.[3] It would provide space for the gasoline station's cashier, space for storage, an office for the gasoline station, and equipment related to the gasoline station. It would also include space for the sale of retail goods, including items related to the gasoline station such as oil and ice scrapers, as well as general retail items, such as groceries, beverages, and snacks, and a variety of goods used by travelers and homeowners alike. A typical retail store associated with other Champlain Oil gasoline service stations will stock over 6,000 different items (e.g., mittens, movies, batteries, pliers, coolers, and novelty collectables).

7.      The proposed fast-food restaurant will have thirty-four seats and comprise the building's remaining 2,200 square feet. It will also have a drive-up service window accessed by a drive-through lane that wraps around the rear of the building. The proposal appears much like a typical "drive-thru" at a fast-food restaurant, where customers remain in their vehicle and review a menu-board at the rear of the building before ordering through a microphone. They then proceed to the drive-up service window where they stop, pay for the order, and receive their food. Applicant's sketch plans delineate a space in front of the service window where customers will temporarily wait as their orders are processed.

8.      The proposal also involves installing wastewater and stormwater systems, both of which would be generally located behind the proposed building. The parties dispute the precise location of these two systems, but it is undisputed that a sizable portion (i.e., over 30%) of both systems will be located within the Conservation District.[4]

9.      Between June 3, 2009, and August 5, 2009, the ZBA held three public hearings on Applicant's application; it also conducted a site visit immediately before the August 5 hearing. The ZBA ultimately granted Applicant a conditional use permit, subject to fourteen conditions, on September 16, 2009.

---

[3]  Applicant concedes for the purposes of the pending motions that the application involves a convenience store. Applicant has reserved the right, however, to argue at trial that the proposal does not involve a convenience store, in the event that we conclude a convenience store is prohibited in the HC District.

[4]  In addition to the location dispute, the amount of the two systems sited within the Conservation District depends on whether the zoning district boundaries can be altered. See Bylaws § 5.19 (allowing in certain situations a landowner to extend the boundary line of the less restrictive zoning district up to thirty feet into the more restrictive zone). We make no ruling today on the applicability of this provision to Applicant's proposal.

10. Applicant filed a timely notice of appeal with this Court on October 8, 2009. Applicant's Statement of Questions asks whether eight of the ZBA's conditions are appropriate and valid.

11. Opponents filed a notice of appeal on October 14, 2009, and their twelve-question Statement of Questions raises a number of issues, but generally asks whether Applicant's proposal complies with the applicable bylaws and otherwise deserves conditional use approval.

### Discussion

Applicant proposes to construct and operate a gasoline station, a retail store, and a fast-food restaurant on a yet-to-be-created 9.04-acre parcel that spans three different zoning districts. The cross appeals filed with this Court raise a number of questions, many of which are fact-dependant, but Applicant and Opponents each seek a summary ruling in their favor on a limited set of legal issues:

(1) Whether the proposed retail store may be permitted under the Bylaws;

(2) Whether the drive-up service window, as described in the application, may be permitted under the Bylaws as part of the proposed restaurant; and

(3) Whether portions of the proposed stormwater system and wastewater disposal system, which are located outside the Highway Commercial District, may be permitted under the Bylaws.

Our review of the pending cross-motions must begin with the reminder that summary judgment is appropriate only "when there are no genuine issues of material fact and, viewing the evidence in a light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." In re Carter, 2004 VT 21, ¶ 6, 176 Vt. 322; V.R.C.P. 56(c). "When both parties move for summary judgment, each is entitled to the benefit of all reasonable doubts and inferences when the opposing party's motion is being judged." City of Burlington v. Fairpoint Commc'ns, 2009 VT 59, ¶ 5 (citing Toys, Inc. v. F.M. Burlington Co., 155 Vt. 44, 48 (1990)). We apply these standards to the three issues raised by the pending motions.

### 1. The Proposed Retail Store

The first issue concerns whether Applicant's proposed retail store is a permitted use in the HC District. Part of Applicant's proposal includes a 2,600-square-foot store designed to sell a wide variety of retail goods, such as motor oil, ice scrapers, groceries, beverages, and snacks, and merchandise ranging from mittens and movies to batteries and collectables. A "retail store" is expressly listed as a permissible conditional use in the HC District. Bylaws § 4.4(B)(20). This

4

includes "[a]ny enclosed business concerned primarily with rental or the sale of produce, products, goods, equipment or commodities; and excluding any drive-in facility, road side agricultural stand, gasoline or motor vehicle service station, motor vehicle sales facility, restaurant or junk yard." Bylaws § 2.2 (defining "retail store"). For the reasons detailed below, we conclude that Applicant's proposed store fits this definition and is therefore a permissible use in the HC District.

Opponents challenge this conclusion and argue that Applicant's proposed store is more accurately characterized as a convenience store: "an establishment whose principal use is the sale of products in small quantities for the daily use of customers including, but not limited to, bakeries, food stores, news stands, tobacco shops, card shops, liquor stores, delicatessens, music supply stores, pet stores, jewelry stores, camera and photography supplies, ice cream parlors, meat and seafood shops and florist shops." Bylaws § 2.2 (defining "convenience, retail"). Although defined in the Bylaws, a convenience store is not listed as a permissible use in the HC District, and Opponents point out that "[a]ny use not expressly permitted in a district is prohibited in that district." Bylaws § 3.5. Opponents contend that Applicant's convenience store is therefore prohibited. We reject this reasoning for the following reasons.

Even if Applicant's proposed retail store constitutes a convenience store, there is no indication that convenience retail stores are prohibited in the HC District. A "convenience retail" store appears to be merely one type of "retail store." That a "convenience retail" store is also defined in the Bylaws does not demonstrate the intent to prohibit them in the HC District, particularly when the broader category of "retail stores" is explicitly permitted. Concluding otherwise would contradict the plain language of the Bylaws, which expressly permits "[a]ny enclosed business concerned primarily with rental or the sale of produce, products, goods, equipment or commodities." Bylaws § 2.2 (defining "retail store").

If the drafters intend to prohibit convenience stores in the HC District, they must do so with more clarity. See In re John J. Flynn Estate, No. 4C0790-2-EB, Findings of Fact, Conclusions of Law, & Order, at 28 (Vt. Envtl. Bd. May 4, 2004) (noting that a provision must be "sufficiently clear to guide the conduct of an average person, using common sense and understanding"). Merely defining "convenience retail" in the Bylaws does not give a landowner fair notice that convenience stores are prohibited in the HC District, especially when retail stores are expressly permitted. In re Handy, 171 Vt. 336, 347–48 (2000) (explaining that a landowner

5

must be "given fair notice of what it can and cannot do with the land"). The drafters could have excluded "convenience stores" from the definition of "retail stores," just as they excluded a number of other uses from the definition of "retail stores." See Bylaws § 2.2 (excluding from the definition of "retail store" roadside agricultural stands, motor vehicle sales facilities, restaurants, and junk yards). Without any evidence that convenience stores are to be excluded from the umbrella definition of retail stores, which are specifically allowed, we conclude that Applicant's convenience store is permissible in the HC District as a kind of retail store.

Opponents argue that this conclusion renders the definition of "convenience retail" store wasted ink. Rather than interpreting the definition as surplusage, Opponents ask the Court to give meaning to the language by applying a familiar rule of statutory construction: when two statutes cover the same subject and one is more specific than the other, they are harmonized by giving effect to the more specific provision. Our Lady of Ephesus House of Prayer, Inc. v. Town of Jamaica, 2005 VT 16, ¶ 16, 178 Vt. 35. Opponents contend that the more general definition of "retail store" should apply only when the specific definition of "convenience retail" is not applicable to a proposed project.

A specific statute will normally control over a more general one "unless the legislature intended the general to control." Looker v. City of Rutland, 144 Vt. 344, 346–47 (1984). Here, the drafters expressed their determination to allow "retail stores" in the HC District; it is specifically listed as a conditional use. Opponents' approach undermines this intent. Were we to prohibit "convenience retail" stores in the HC District, we must also prohibit retail sales, since "retail sales" is defined in the Bylaws and omitted from the list of permissible uses in the HC District. See Bylaws § 4.4 (listing conditional uses). Following this approach leaves us wondering what type of "retail stores" the drafters intended to permit in the HC District; the breadth of stores prohibited as either "retail sales" or "convenience retail" stores would effectively prohibit all "retail stores" in the HC District.[5] The exception would swallow the rule, thereby thwarting the drafters' clear intent to permit "retail stores" in the HC District (i.e., a

---

[5] Businesses falling under the definition of "retail sales" or "convenience retail" store that would be prohibited from the HC District include, but are not limited to, bakeries, food stores, news stands, tobacco shops, card shops, liquor stores, delicatessens, music supply stores, pet stores, jewelry stores, camera and photography supplies, ice cream parlors, meat and seafood shops, and florist shops, as well as the sale of hardware, paint, office equipment, sporting goods, trading stamp and redemption outlets, television, satellite dishes, automotive supply and major household appliance stores. See Bylaws § 2.2 (expressly including these businesses in the definitions of "retail sales" and "convenience, retail").

6

business "concerned primarily with rental or the sale of produce, products, goods, equipment or commodities").

Based on the foregoing, we conclude that Applicant's proposed store is a "retail store," as that term is defined in the Bylaws and expressly listed as a conditional use in the HC District. It matters not that the proposed store may also be a convenience store because the drafters have not demonstrated the intent to exclude convenience stores from the definition of retail stores. Accordingly, even when viewing the facts in a light most favorable to Opponents, we **GRANT** Applicant and **DENY** Opponents summary judgment on this issue.

## 2. The Proposed Drive-up Service Window as Part of the Fast-Food Restaurant

The second issue raised by the pending cross-motions involves whether Applicant's proposed restaurant and associated drive-up service window are permitted in the HC District. As part of the proposed thirty-four seat fast-food restaurant, Applicant intends to provide a drive-up service window, which customers would access via a drive-through lane that wraps around the rear of the building. Opponents argue that Applicant's proposal is a "drive-in facility," and it seeks a summary ruling that Applicant's proposal is prohibited because drive-in facilities are not listed as permissible uses in the HC District. See Bylaws § 3.5 ("Any use not expressly permitted in a district is prohibited in that district.").

Applicant responds by first contending that the proposal does not involve a drive-in facility; rather, the project involves a "drive-up service window." This argument is unavailing. A "drive-in facility" is defined as "[a]n establishment designed or operated to serve a patron while seated in a motor vehicle parked in an off-street parking space." Bylaws § 2.2. There is no dispute that Applicant intends to serve patrons while they are seated in a motor vehicle; they will order off a menu board at the rear of the building and drive up to the service window, where they will pay for and wait for their order. The only dispute appears to be whether these customers will be parked in an off-street parking space while they wait. For the following reasons, we answer in the affirmative.

The Bylaws define "parking space" as an "[o]ff-street space used for the temporary location of one licensed motor vehicle, such space being at least nine feet wide and twenty-two feet long, not including access driveway, and having direct access to a street." Bylaws § 2.2. The facts in the record indicate that the proposed drive-through lane will contain an off-street parking space beside the service window where customers will temporarily park their cars while

7

they await their order. The proposed space will have direct access to a street and there is no dispute that it will be at least nine feet wide and twenty-two feet long, not including the drive-through lane.

Applicant argues that this determination contradicts the common sense understanding of a "parking space," which Applicant describes as an authorized place where a driver may park their vehicle so as to not hinder traffic flow. However, it matters not what "parking space" is commonly understood to mean because "the definition in the bylaw controls." In re Korbet, 2005 VT 7, ¶ 11, 178 Vt. 459 (citing In re Stowe Club Highlands, 164 Vt. 272, 278 (1995)). Under the definition in the Bylaws, Applicant's proposal involves an off-street parking space: patrons will temporarily locate their motor vehicle directly in front of the drive-up service window while they wait for their order. Applicant's sketch plans delineate the precise location of the parking space. Accordingly, even when viewing the facts in a light most favorable to Applicant, we conclude that Applicant's proposal involves serving a patron while seated in a motor vehicle in an off-street parking space. The proposal therefore involves a "drive-in facility," as that term is used in the Bylaws.

Despite this conclusion, our inquiry on this issue does not end here. Opponents request a summary ruling that a drive-in facility is not a permissible use in the HC District, making the same argument discussed above: "drive-in facility" is defined in the Bylaws but not listed as a permissible use in the HC District, and "[a]ny use not expressly permitted in a district is prohibited in that district." Bylaws § 3.5. Applicant responds that the proposed drive-in facility is a component of the fast-food restaurant, and it argues that a restaurant is a permissible use in the HC District. Bylaws § 4.4(B)(19). After all, many contemporary restaurants provide customers with a drive-through option.

A permissible restaurant in the HC District is "[a] public eating establishment in which the primary function is the preparation and serving of food." See Bylaws § 2.2. Under this definition, a drive-in facility is a valid component to a permissible restaurant; there is no indication that a restaurant may not include a drive-in facility. The mere fact that the drafters defined drive-in facility in the Bylaws is not sufficient, in our judgment, to demonstrate the intent to prohibit drive-in facilities at restaurants in the HC District, especially since restaurants are expressly permitted. See In re John J. Flynn Estate, No. 4C0790-2-EB, Findings of Fact, Conclusions of Law, & Order, at 28 (Vt. Envtl. Bd. May 4, 2004) (noting that a provision must

8

be "sufficiently clear to guide the conduct of an average person, using common sense and understanding"). If the drafters were inclined to prohibit restaurants from utilizing drive-in facilities, they could have done so expressly, much like what was done to prohibit retail stores from incorporating drive-in facilities. The drafters defined "retail store" as any business that rents or sells products or commodities, "excluding any drive-in facility." Bylaws § 2.2. No such exclusion was used to define restaurants, and we have no authority to impose such an exclusion.

Accordingly, even when viewing the facts in a light most favorable to Opponents, we conclude that Applicant's drive-in facility is an acceptable component to the proposed fast-food restaurant. There is no indication that the drafters intended to prohibit restaurants in the HC District from incorporating a drive-in facility. We therefore **GRANT** Applicant and **DENY** Opponents summary judgment on this issue.

### 3. Locating the Wastewater and Stormwater Systems in the Conservation District

The final issue raised by the pending motions concerns the location of the wastewater and stormwater systems serving the fast-food restaurant, gas station, and retail store. The proposed 9.04-acre project site lies in multiple zoning districts, and Applicant intends to locate a portion of both the wastewater and stormwater systems in the Conservation District. The parties dispute exactly how much of the two water systems will be located within the Conservation District, and the extent of the encroachment depends on the applicability of Bylaws § 5.19 (which allows zoning district boundaries to be extended in some situations).[6] But two facts are undisputed: a sizable portion of each system is located in the Conservation District, and the project site is below the twenty-five-acre minimum lot-size requirement for the Conservation District. Bylaws § 4.3(C)(1).

As is emphasized by Opponents, no land development may occur in the Conservation District unless it is in conformance with the district requirements. Bylaws § 3.5. Opponents seek a summary ruling that neither the wastewater nor the stormwater system may be located in the Conservation District because it constitutes land development of a to-be-created, undersized

---

[6] Bylaws § 5.19 says: "Where a district boundary line divides a lot of record at the time such line is adopted, the regulations for the less restricted part of such lot shall extent [sic] not more than thirty feet into the more restricted lot." Bylaws § 5.19. The very language of § 5.19 appears to make it inapplicable to Applicant's proposed project, since the to-be-created lot does not yet exist, and therefore did not exist "at the time such [zoning district] lines [were] adopted." Id. We do not address this legal question in detail, however, since it is not dispositive of the issues presented. Regardless of the applicability of § 5.19, a sizeable portion of the proposed wastewater and stormwater systems lie within the applicable portion of the Conservation District.

9

parcel in that District. See Bylaws § 2.2 (defining "land development" as a change in use of any land). Applicant argues in opposition that this would create an absurd result, contending that the Bylaws cannot be read to prohibit land development on an undersized portion of a split lot. This argument fails to appreciate the effect of locating a lot in multiple zoning districts, and as a result, it must be rejected.

The general rule regarding split lots is that such a lot must comply with the zoning district requirements for each district occupied. In re Windjammer Hospitality, 172 Vt. 560, 561 (2001) (mem.) (citing McLaughry v. Town of Norwich, 140 Vt. 49, 54–55 (1981)). Contrary to Applicant's criticism of this legal analysis, the size of the entire lot is the focus of our analysis, not simply the portion of the lot within the respective districts. Id. at 562 (allowing a development applicant to "make a passive use of the more restrictive zone to meet zoning requirements for active improvements planned for the less restricted portion of the lot"). In fact, much like in Windjammer, Applicant's development plan relies upon the subdivision of an existing "split lot, which is currently in compliance with the [Town's] bylaws, rendering one of the resulting lots noncompliant." Id. Applicant here is more accurately accused of a greater zoning transgression, since its development proposal will result in two reconfigured lots, both of which will be noncompliant with the minimum lot size requirements of the Conservation District: the to-be-developed parcel will contain 9.04± acres, and the Burdicks will retain a lot that is reduced in size to 17.73± acres.[7]

A split lot that fails to meet the dimensional requirements for all zoning districts occupied is considered a nonconforming lot. See, e.g., Myers 2-Lot Subdivision Final Plat, No. 121-6-09 Vtec, slip op. at 3–4 (Vt. Envtl. Ct. Apr. 28, 2010) (Durkin, J.) (denying a subdivision application because a portion of the resulting split lot was undersized for the district in which it was located). A nonconforming, undersized lot may not be developed unless it qualifies for the limited exemption afforded preexisting undersized lots. See In re Mastelli Const. Application,

---

[7] Applicants provide a helpful table that summarizes the lot configurations, before and after the proposed lot line adjustments. See Applicant's Reply Mem. at 18 (Mar. 22, 2010).

Applicants appear to misconstrue Opponents' legal analysis, now adopted by this Court, asserting that such a ruling would result in a prohibition of all development on all lots. Id. at 18. Again, we afford inclusion of all acreage in a lot when considering whether that lot conforms, as it must, to dimensional requirements for all zoning districts which the property occupies. Bylaws § 3.5. Applicant further complains, incorrectly we conclude, that Opponents' suggested analysis renders all undersized lots undevelopable. Our analysis here does not support such an erroneous conclusion, since the Bylaws allow for the development of preexisting, undersized lots. Bylaws § 5.7. The deficiency in Applicants project plans are that they rely upon the new creation of undersized lots. We cannot authorize development that creates a nonconformity.

No. 2009-072, slip op. at 2 (Vt. Sept. 4, 2009) (unpub. mem.) (noting that small lots are considered nonconforming uses, and one "goal of zoning is to phase out such uses" (quoting Drumheller v. Shelburne Zoning Bd. of Adjustment, 155 Vt. 524, 529 (1990))).

This exemption is found in Bylaws § 5.7, which states that undersized lots existing at the time of the Bylaws' enactment "may be developed for the purposes permitted in the district in which it is located, even though not conforming to minimum lot size requirements," if the lot is larger than one-eighth of an acre and forty feet wide. Bylaws § 5.7. However, the record before us does not indicate that Applicant's 9.04-acre project site qualifies as a preexisting lot. Quite simply, Applicant's 9.04-acre project site does not yet exist. Certain events must first occur before Applicant's 9.04-acre project site is created: the boundary line between the Burdick and Llona properties must be adjusted; the 6.54 acres must be transferred from Ms. Burdick to the Llonas; and the Burdicks must be allowed to retain a lot that is even smaller and less compliant than the land they once held.

Not only does the project site not yet exist, but the nonconformity with the Conservation District's minimum lot size is a direct result of the proposed boundary adjustment and land transaction. To explain, the Llonas' existing 2.5-acre parcel contains no property in the Conservation District, but when Ms. Burdick transfers 6.54 acres to the Llonas, a portion of that land will lie in the Conservation District. This transaction will therefore create a 9.04-acre split lot that contains a nonconforming, undersized quantity of land in regards to the Conservation District. With this in mind, we cannot sustain a finding that Applicant's project site is a preexisting small lot and thereby entitled to exemption from the minimum lot size requirements for this zoning district.

Accordingly, we conclude that the proposed 9.04-acre project site, if allowed to be created, would constitute a lot that fails to conform to the applicable zoning requirements. Our analysis here doesn't depend upon the nature of the development to occur on the lot, nor does it depend upon the proper classification of the support systems that would be constructed upon the portion of the lot that is within the Conservation District. Rather, our analysis begins and ends with a determination that the to-be-reconfigured lot will be undersized and therefore nonconforming. To authorize this lot to be developed would be to allow a disregard of the applicable zoning regulations, the general purpose of which is to cause the eventual elimination of nonconformities, and not to encourage them. See In re Richards, 2005 VT 23, ¶ 6, 178 Vt.

11

478 (mem.) ("[O]ne goal of zoning is to phase out nonconforming uses, including undersize[d] lots.").

In reaching this conclusion, we specifically reject Applicant's characterization of this legal analysis as resulting in an absurd prohibition of any development of a split lot, simply because a portion of it lies in a more restrictive district. Contrary to Applicant's assertion, preexisting, undersized lots may be developed when they otherwise conform to the applicable district regulations. Bylaws § 5.7. Further, a landowner can develop portions of a preexisting split lot that meet the size requirements for the district the development is to occupy. See e.g., McLaughry v. Town of Norwich, 140 Vt. 49, 54–55 (1981) (noting that the split lot could be used "for two different purposes; that is, that part of it which lies within the business district could be used for business purposes, and that part of the property lying within the residential district could be used for residential purposes"). A landowner can also aggregate the portions of a split lot occupying other zoning districts to calculate the split lot's total size, thereby satisfying any size requirements for the portion to be developed. See, e.g., Windjammer, 172 Vt. at 562 ("[U]se of land in another zoning district . . . solely to meet dimensional requirements is considered a permissible abstract or passive use where . . . it appears both zoning districts permit the proposed active use." (quoting Boulter Bros. Const. Co. v. Zoning Bd. of Appeals of Norfolk, 697 N.E.2d 997, 999 (Mass. App. Ct. 1998))).

We also note in closing that the Town is not prohibiting Applicant from locating a wastewater system off-lot, which Applicant contends is prohibited. See Guidance Related to the Wastewater System and Potable Water Supply Rules, Vt. Dept. of Conservation, Wastewater Mgmt. Div., at 2 (Sept. 29, 2007), available at http://www.anr.state.vt.us/dec/ww/protection/ guidance2007-01.universaljurisdiction.pdf. The Bylaws merely require any wastewater system to be located on a sufficiently sized lot. See Bylaws § 4.3(C)(1) (establishing a minimum lot size). Further, Applicant's wastewater system is proposed to be located on the project site, not off-lot.

Based on the foregoing, we conclude that Applicant may not proceed with the proposed land development in the Conservation District because the to-be created lot does not conform to the minimum size requirements for that district. As a result of this conclusion, we need not consider whether Applicant's proposed stormwater and wastewater systems are permissible in the Conservation District. Even if we determined that such use is permitted in the Conservation

District, no land development may occur on a to-be-created lot that is undersized.  We therefore **GRANT** Opponents and **DENY** Applicant summary judgment on this issue.

## Conclusion

For all the reasons more fully discussed above, we **GRANT** Applicant summary judgment with regard to the first and second issues raised in the pending cross-motions.  In so doing, we conclude that Applicant's proposed retail store is permitted in the HC District, whether or not it is also a convenience store, and that Applicant's proposed drive-in facility is allowed as part of a restaurant that is permitted in the HC District.  Opponents' motion for summary judgment on these issues is therefore **DENIED**.

On the other hand, we **GRANT** Opponents summary judgment with regard to Applicant's request for conditional use approval for its proposed development, since the development is proposed for a to-be-created lot that does not conform to the minimum size requirements for all zoning districts in which it is located.  Accordingly, we conclude that Applicant's proposed project, as currently configured, cannot receive conditional use approval as a matter of law.

A Judgment Order accompanies this Decision.  This completes the current proceedings before this Court concerning these appeals.

Done at Newfane, Vermont, this 16th day of July 2010.

_____
Thomas S. Durkin, Environmental Judge

13