Filed 06/18/24

VERMONT SUPERIOR COURT
Environmental Division
32 Cherry St, 2nd Floor, Suite 303,
Burlington, VT 05401
802-951-1740
www.vermontjudiciary.org



Docket No. 23-ENV-00081

---

| | |
|---|---|
| **Bourne Final Plat Application** | **DECISION ON MOTIONS** |

---

This is an appeal of a City of South Burlington Development Review Board ("DRB") decision dated August 2, 2023, denying Gary Bourne's ("Applicant") application to create a Planned Unit Development ("PUD") on property located at 760 Shelburne Road, South Burlington, Vermont (the "Property"). Specifically, the proposed project is to re-subdivide three existing lots into three new reconfigured lots with a bank, a 2-story mixed commercial and residential building, and a 3-story 27-unit multifamily residential building. Presently before the Court are the parties' cross motions for partial summary judgment.[1]

In this matter, Applicant is represented by Attorney Mark G. Hall. The City of South Burlington (the "City") is represented by Attorneys David W. Rugh and Beriah C. Smith.

## Legal Standard

To prevail on a motion for summary judgment, the moving party must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." V.R.C.P. 56(a), applicable here through V.R.E.C.P. 5(a)(2). When considering cross-motions for summary judgment, the Court considers each motion individually and gives the opposing party the benefit of all reasonable doubts and inferences. City of Burlington v. Fairpoint Commc'ns, Inc., 2009 VT 59, ¶ 5, 186 Vt. 332. In determining whether there is any dispute over a material fact, "we accept as true allegations made in opposition to the motion for summary judgment, so long as they are supported by affidavits or other evidentiary material." White v. Quechee Lakes Landowners' Ass'n, Inc., 170 Vt. 25, 28 (1999) (citation omitted); V.R.C.P. 56(c)(1)(A).

---

[1] There are presently four separate motions for partial summary judgment pending before the Court. This is because the parties initially filed cross motions on Question 1 of Applicant's Statement of Questions. While those motions were pending, the parties then filed additional cross motions with respect to Question 3. This Decision addresses all four motions.

We recite the following factual background and procedural history, which we understand to be undisputed unless otherwise noted, based on the record now before us and for the purpose of deciding the pending motions. The following are not specific factual findings relevant outside the scope of this decision on the pending motions. See Blake v. Nationwide Ins. Co., 2006 VT 48, ¶ 21, 180 Vt. 14 (citing Fritzeen v. Trudell Consulting Eng'rs, Inc., 170 Vt. 632, 633 (2000) (mem.)).

1. This is an application submitted by Gary Bourne (Applicant) for a General Planned Unit Development for property located at 760 Shelburne Road, South Burlington, Vermont (previously defined as the "Property").

2. The project is located in the Commercial 1-R15 Zoning District, the Traffic Overlay District, the Transit Overlay District, and the Urban Design Secondary Node Overlay District as set forth in the South Burlington Land Development Regulations ("SBLDR").

3. The application seeks to re-subdivide three existing lots at the Property into three reconfigured new lots consisting of a bank on Lot 1; a 2-story mixed commercial and residential building on Lot 2, and a 3-story 27-unit multifamily building on Lot 3.

4. In total, the application proposes to include 30 dwelling units and is subject to the minimum requirements for Inclusionary Zoning in the SBLDR. SBLDR § 18.01B(2)(a).

5. Inclusionary Zoning establishes the minimum requirements and incentives for the construction of housing to meet the needs of low- and moderate-income households. SBLDR Art. II ("Inclusionary Zoning").

6. At the project's location, the residential base zoning density is 20 units.

7. Of those 20 units, the SBLDR require that 15% must be inclusionary rental units. SBLDR § 18.01C(1).

8. As such, 3 inclusionary rental units are required within the 20 base density units.

9. One additional market rate dwelling unit is allowed for each mandatory inclusionary rental unit constructed. SBLDR § 18.01F(2).

10. The base maximum density plus the additional units offsetting each mandatory inclusionary rental unit leads to a total of 23 units (20 market rate and 3 inclusionary) that may be constructed at the Property.

11. The SBLDR permits density bonuses of up to 50% of the base maximum density if an applicant voluntarily adds additional inclusionary units. SBLDR § 18.01G(2).

12. In this case, the maximum density, with the density bonus, is 30 units.

13. Applicant has proposed constructing a total of 7 inclusionary units and 23 market rate units.

14. In addition to the residential units, Applicant proposes constructing a bank drive-through automated teller machine ("ATM").

**Statement of Questions**

In the Environmental Division, the Statement of Questions provides notice to other parties and this Court of the issues to be determined within the case and limits the scope of the appeal. In re Conlon CU Permit, No. 2-1-12 Vtec, slip op. at 1 (Vt. Super. Ct. Envtl. Div. Aug. 30, 2012) (Durkin, J.). As filed, Applicant's Statement of Questions presents the following Questions for the Court's review:

1. What is the proper calculation of inclusionary and market-rate housing units under § 18.01 of the South Burlington Zoning Ordinance?
2. Whether the applicant is required to locate inclusionary units evenly throughout the development?
3. Should the applicant be permitted to install a drive-up ATM on the property?

Applicant's Statement of Questions (filed on Aug. 22, 2023).

**Discussion**

The parties agree that the Questions presented for review are issues of legal interpretation which require the Court to review the relevant provisions in the SBLDR. In doing so, we apply the principles of statutory construction. In re Confluence Behavioral Health, LLC, 2017 VT 112, ¶ 17, 206 Vt. 302. The primary goal in interpreting a zoning ordinance is to give effect to the legislative intent. Id. at ¶ 20. We "construe an ordinance's words according to their plain and ordinary meaning, giving effect to the whole and every part of the ordinance." Id. (citing In re Laberge Moto-Cross Track, 2011 VT 1, ¶ 8, 189 Vt. 578). With these principles in mind, we turn to the relevant SBLDR provisions that the parties ask the Court to interpret.

## I. Density Bonus

The parties disagree as to the proper calculation of inclusionary and market-rate housing units that is necessary to achieve a maximum density of 30 total units. Neither party disputes that the base density unit maximum for the Project is 20 units. Nor do the parties dispute that three of these units (15%) are mandated as inclusionary units. Applicant is then entitled to an additional three dwelling

units above the base density to offset the mandatory inclusionary units, bringing the total number of units to 23, with three of those units being inclusionary. The present dispute before the Court relates to the density bonus provision of the SBLDR, which allows the maximum density of a residential development to increase beyond the base maximum density by up to 50% of the base density if the applicant voluntarily includes more than the mandatory number of inclusionary units in the base density calculations.

Specifically, SBLDR § 18.01G(2) explains density bonuses as:

> When an applicant voluntarily includes, in the base zoning density unit-maximum for the development, more than the number of inclusionary units required under Section 18.01(C)(1), then upon the applicant's request, the development shall receive, in addition to the offset units, a density bonus. The density bonus shall be one dwelling unit for each voluntary Inclusionary Rental Unit and two dwelling units for each voluntary Inclusionary Ownership Unit, up to a maximum density of 50% more than the base maximum density permitted in the zoning district. In zoning districts where additional density is permitted via Planned Unit Development, the base density shall be defined as the maximum density for the district without use of PUDs. Density bonus dwelling units are not subject to the inclusionary affordability requirements.

Applicant seeks to use the density bonus to allow a maximum density of 30 units. To obtain the benefit of the density bonus, Applicant argues that half of the bonus units need to be inclusionary and the other half market rate. Based on this interpretation, Applicant proposes a total makeup of 7 inclusionary units and 23 market rate units. With three inclusionary units being the mandatory inclusionary units within their base density. In contrast, the City argues that to take advantage of the density bonus and reach a maximum density of 30 units, Applicant would need to voluntarily designate seven of the base density units as inclusionary. This would result in a total of 10 inclusionary and 20 market rate units with the density bonus. For the following reasons, we conclude that the City's interpretation of § 18.01G(2) is correct.

Section 18.01G(2) specifies that in order to unlock the density bonus, a developer must voluntarily include additional inclusionary units "in the base zoning density unit-maximum." SBLDR § 18.01G(2) (emphasis added). Only then does the developer receive the bonus units, which are "not subject to the inclusionary affordability requirements." Id. (emphasis added). The plain language of this section is clear and unambiguous. In order to receive the maximum project density of 30 units, Applicant would need to include 10 total inclusionary units within the base density of the project, or seven units beyond what is mandatory. Only then would Applicant be able to obtain the ability to

add seven market rate bonus units.[2] Nevertheless, Applicant seeks to add those seven bonus units by only including four additional inclusionary units beyond the three mandatory units. This contravenes the plain language of the density bonus provision and would lead to three fewer inclusionary units in the overall project.[3] Thus, we conclude that Applicant failed to include the requisite number of inclusionary units to be eligible for the maximum project density. These material facts are not in dispute, and therefore the City is entitled to judgment as a matter of law. Accordingly, we **GRANT** the City's motion for partial summary judgment on Question 1 and **DENY** Applicant's motion.

## II. Drive through ATM

Applicant's Question 3 asks whether he should be permitted to construct a drive-through ATM on the Property. Applicant argues that a bank and drive-through are a permitted use in the zoning district in which the Property is located. Applicant further argues that, because the bank and drive-through is a permitted use, there is a direct conflict within the SBLDR Planned Unit Development standards that must be resolved in his favor. Specifically, Applicant points to a conflict within SBLDR § 15.C.04(F), which states, in relevant part, that:

> Allowed uses within a PUD, unless otherwise expressly allowed or prohibited by PUD type, include any use listed in Appendix C as a permitted or conditional use in the underlying zoning district(s) that can be accommodated within, or in association with, designated land use allocations and allowed building types.
> . . .
>> (2) Given the emphasis on compact, walkable forms of residential and mixed use development within a PUD, auto-oriented uses, building types, and facilities . . . are generally precluded from locating within a PUD . . . . New drive-through facilities are prohibited from locating within a PUD.

Banks and drive-throughs are otherwise permitted in the Commercial 1-R15 zoning district, in which the Property is partially located. Therefore, Applicant suggests that the purported conflict involves the first and last sentences of § 15.C.04(F). Applicant suggests that these two sentences cannot be reconciled because a bank and drive-through are otherwise permitted in the district, yet,

---

[2] This seven-unit bonus, plus the three-unit offset that Applicant receives for including the 3 mandatory inclusionary units results in a total of 30 units.

[3] Applicant's motion suggests that adopting the City's interpretation would force Applicant to abandon the density bonus and settle for a total of 23 units. This is not a legal argument, but instead what Applicant seems to proffer he will practically do to the scope of this project if required to include three additional inclusionary units. There is no provision of statutory or bylaw interpretation that would allow the Court to consider this argument. Nevertheless, Applicant is entitled to amend his application based on the Court's conclusions herein should he so desire.

these facilities are expressly prohibited from being located within a PUD. We disagree that this presents a conflict and conclude that § 15.C.04(F) is clear and unambiguous.

The first sentence of § 15.C.04(F) states a general rule, which is followed by specific limitations to that rule. See In re Application of Lathrop Ltd. P'ship I, 2015 VT 49, ¶ 31, 199 Vt. 19 (explaining that when an ordinance contains general and specific provisions, the specific provision must prevail and be treated as an exception to the general provision). The provision specifically contemplates exceptions to the rule that an allowed use in an underlying zoning district is allowed within a PUD. Subsection (2) contains a clear and unambiguous prohibition on new drive-through facilities. This is not a conflict, but rather an explicit prohibition on locating such facilities within a PUD. It is undisputed that the drive-through ATM is classified as a drive-through facility, and therefore it is prohibited by § 15.C.04(F)(2).

Next, Applicant argues that even if § 15.C.04(F) prohibits him from including a drive-through ATM, that prohibition should be waived at the Court's discretion. In support of this argument, Applicant points to SBLDR § 15.C.01(A)(2) which states, in relevant part, that:

> The DRB also has the authority to modify the Land Development Regulations in association with PUD review, <u>subject to the standards and conditions for Planned Unit Development</u>, as specified by PUD type under this Article, in support of more efficient, compact, walkable, and well-planned forms of residential neighborhood, mixed use, and infill development, and the permanent conservation of resource lands and other open space.
>> (a)  In addition to modifications or waivers intended to accommodate site constraints under Section 15.A.01 of the subdivision regulations, this may include <u>modifications of underlying zoning and subdivision regulations</u> pertaining to blocks, building lots, building types, allowed densities of development, and the type and mix of allowed uses.

Applicant argues that § 15.C.01(A) authorizes the DRB, and by extension this Court, to waive or modify the applicable standards for PUD review, including the prohibition against new drive-through facilities. We disagree.

Section 15.C.01(A) authorizes the DRB to modify the "<u>underlying zoning and subdivision regulations</u>." SBLDR § 15.C.01(A)(2)(a) (emphasis added). This is consistent with the general purpose of PUDs, which are intended to create flexibility from the underlying land development regulations. See 24 V.S.A. § 4417(a)–(d) (listing the various ways in which PUDs create flexibility from underlying regulations). Nothing in § 15.C.01(A) authorizes the DRB to waive the specific PUD standards. In fact, § 15.C.01(A) specifically notes that any modification of the Regulations is "<u>subject to the standards and conditions for Planned Unit Development</u>." SBLDR § 15.C.01(A)(2) (emphasis added).

Thus, neither the DRB or this Court have the authority to waive specific PUD standards and conditions, including the prohibition against drive-through facilities. Accordingly, we conclude the material facts are not in dispute and must answer Question 3 in the negative as a matter of law. In doing so, we **GRANT** the City's motion for partial summary judgment and **DENY** Applicant's motion.

<u>**Conclusion**</u>

For the foregoing reasons, we conclude that there is no genuine dispute of material fact regarding the proposed development and the applicable standards in the SBLDR. In interpreting these standards, we conclude that Applicant failed to include the requisite number of inclusionary rental units in the base density calculations to reach the 30-unit bonus density maximum. Furthermore, we conclude that the drive-through ATM is prohibited by the Regulations and there is no applicable waiver provision that would allow this Court to rule otherwise. Accordingly, we **GRANT** both of the City's motions for partial summary judgment and **DENY** Applicant's motions.[4]

The Court will set this matter for a status conference to determine how best to proceed with the remaining Question before the Court.

Electronically signed June 18, 2024 pursuant to V.R.E.F. 9(D).

Thomas G. Walsh, Judge
Superior Court, Environmental Division

---

[4] The Court is well aware of the need for additional housing statewide and that this project site is ripe for redevelopment. Either party can modify its approach to this development; the Applicant can revise his project or the City can amend its regulations.