**STATE OF VERMONT**
**SUPERIOR COURT – ENVIRONMENTAL DIVISION**

|   |   |   |
|---|---|---|
| In re UVM Certificate of Appropriateness | { { { | Docket No. 90-7-12 Vtec |

### Decision on Motions to Cross Motions for Summary Judgment

Currently before the Court are the parties' cross motions for summary judgment. On June 5, 2012, the City of Burlington (City) Development Review Board (DRB) granted a certificate of appropriateness to the University of Vermont (UVM) for its plans to improve an existing athletic field with open air bleachers, lights, a press box, bathrooms, locker rooms, a concession stand, paving, and landscaping (the Project). The DRB considered the Project to be a permitted, rather than conditional, use under the City of Burlington Comprehensive Development Ordinance (CDO). Burlington resident Pike Porter appealed the decision and submitted a Statement of Questions. Burlington resident Chris Flinn entered an appearance to participate in Mr. Porter's appeal as an interested person pursuant to V.R.E.C.P. 5(c). UVM filed a motion for summary judgment or partial summary judgment. Mr. Porter thereafter filed a response in opposition and a motion for partial summary judgment. Mr. Flinn filed his own motion for partial summary judgment on issues appearing in Mr. Porter's Statement of Questions. UVM responded with oppositions to all motions and a cross-motion for summary judgment on Mr. Flinn's motion. Several rounds of responses and replies ensued, including responses filed by the City. Both Mr. Porter and Mr. Flinn appear pro se. UVM is represented by John Collins, Esq. and the City is represented by Kimberlee J. Sturtevant, Esq.

### Factual Background

For the sole purpose of putting the pending motions into context, the Court recites the following facts, all of which we understand to be undisputed unless otherwise noted:

1.     The athletic field in question is located on UVM's main campus on an open parcel on the west side of Spear Street, near the Gutterson athletic facility.

2.     UVM seeks approval for a 3.8 million dollar project to improve the existing playing field with open air bleachers, 70-80 foot tall lights, a press box, bathrooms, locker rooms, a concession stand, paving, and landscaping.

1

3.      For zoning purposes, the Project site lies within the Institutional District and is subject to the UVM Main Street Campus Overlay District (ICC-UVMS District).

4.      As of January 1, 2008, the actual height of the tallest existing structure within the ICC-UVMS District was the tallest of the University Heights buildings, with a building height of 62 feet and its peak at an elevation of 484 feet above sea level.

5.      Mr. Porter resides at 544 South Prospect Street on property deeded to his wife.[1]  At its closest point, the athletic field lies approximately 1,705 feet from their residence.

6.      Mr. Flinn resides at 295 Prospect Street, on the west side of the street.  The approximate distance from the southeast edge of Mr. Flinn's property and the closest edge of the athletic field is approximately 1,930 feet.

7.      Mr. Porter received notice of the DRB hearing as specified by statute.  Mr. Flinn did not receive the same notice as Mr. Porter, but instead received an email one month before the hearing from City staff inviting him to submit comments.

8.      Mr. Porter spoke at the DRB hearing on the Project.  Mr. Flinn did not attend, but he did submit a letter explaining his concerns to the DRB in advance of the hearing.

## Discussion

We may only grant a motion for summary judgment to a moving party upon a showing that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  V.R.C.P. 56(a); V.R.E.C.P. 5(a)(2).  We must "accept as true the [factual] allegations made in opposition to the motion for summary judgment" and give the non-moving party the benefit of all reasonable doubts and inferences.  Robertson v. Mylan Labs., Inc., 2004 VT 15, ¶ 15, 176 Vt. 356; see also V.R.C.P. 56(c).  When considering cross-motions for summary judgment, we look at each motion individually and give the party opposing a motion the benefit of all reasonable doubts and inferences.  City of Burlington v. Fairpoint Commc'ns, 2009 VT 59, ¶ 5, 186 Vt. 332 (citing Toys, Inc. v. F.M. Burlington Co., 155 Vt. 44, 48 (1990)).  Both the party claiming that a material fact is undisputed and the party seeking to establish a dispute of material fact must support their assertions with citations to admissible evidence. V.R.C.P. 56(c)(1); see Reporter's Notes—2012 Amendment, V.R.C.P. 56 ("Rules 56(c)(1)(B) and

---

[1] We refer to this property in this opinion as the Porter property.  Regardless of Mr. Porter's legal interest in the property by virtue of his marriage to Mrs. Porter, Mr. Porter has an interest as an occupant of the property.  We see no practical distinction between the interest of an occupant versus the interest of an owner in the context of this particular case, given the nature of the impacts that Mr. Porter alleges.

(c)(2) clarify that all asserted facts must be based on admissible evidence"). The Environmental Division follows the Vermont Rules of Evidence, but we may admit evidence otherwise inadmissible under those Rules, "if [the proffered evidence] is of a type commonly relied upon by reasonably prudent persons in the conduct of their affairs." V.R.E.C.P. 2(e)(1).

## I.     Procedural Matters

UVM and the City make two procedure-based arguments as to why this Court should deny Mr. Porter and Mr. Flinn's motions. Although these arguments consist of a mere handful of conclusory statements, we briefly address them in turn.

First, UVM claims that this Court established a November 30, 2012 deadline for parties to submit motions for summary judgment and that Mr. Porter and Mr. Flinn's motions were thus filed untimely on December 12 and December 28, 2012, respectively. This contention is simply incorrect. Our scheduling order directed that by November 30, 2012, "[t]he Appellee/Applicant [UVM] shall file any motion to dismiss. Responses to such a motion shall be filed in accordance with the time frame set forth in the [Vermont Rules of Civil Procedure]." In re UVM Certificate of Appropriateness, Docket No. 90-7-12 Vtec, slip op. at 1 (Vt. Super. Ct. Envtl. Div. Nov. 19, 2012) (Walsh, J.). UVM filed its motion—itself arguably untimely at least in part[2]—on December 3, 2012. Thus, once served with UVM's motion, Mr. Porter and Mr. Flinn had up to thirty days to file responsive pleadings. See V.R.C.P. 56(b) ("The adverse party may file a memorandum in opposition, statement of disputed facts[,] and affidavits, if any, up to 30 days after the service of the motion upon the party.") To the extent that Mr. Porter and Mr. Flinn's December 12 and December 28 filings are responsive in nature, those motions were timely. To the extent that they constitute separate motions for summary judgment, our scheduling order did not specify a time frame for such motions by Mr. Porter and Mr. Flinn. Particularly considering that UVM fails to allege any harm resulting from the timing of filings in this case, we decline to dismiss the motions on an alleged technical error by pro se parties, cognizant of our mandate to construe rules of procedure so as to provide "a full and fair determination in every matter coming before the court." See V.R.E.C.P. 1.

---

[2] Of course, challenges to subject matter jurisdiction are appropriate at any time (see V.R.C.P. 12(h)(3)), so the portions of the motion challenging party status could not be considered untimely. We do not rule on whether the rest of the motion was untimely, as our order technically established a deadline for motions to dismiss, and the filing is instead a motion for summary judgment.

Second, UVM and the City both argue that Mr. Porter and Mr. Flinn's motions should be dismissed because neither Mr. Porter nor Mr. Flinn submitted a statement of undisputed material facts in accordance with V.R.C.P. Rule 56(c)(1) and (4), which govern the procedure for supporting contentions of fact in motions for summary judgment. A person moving for summary judgment may argue that he or she is entitled to judgment as a matter of law, acknowledging that no factual dispute exists. Both Mr. Porter and Mr. Flinn responded to UVM's motion for summary judgment and UVM's statement of undisputed material facts with filings that begin by stating that the "facts are not in dispute." These filings provide some law-based arguments. To the extent that Mr. Porter and Mr. Flinn do dispute facts set forth in UVM's motion for summary judgment within their filings, we decline UVM and the City's invitation to deny these pro se parties' motions on a technical failure to file a statement of disputed or undisputed material facts. Of course, in our analysis we remain bound to consider the sufficiency of evidence supporting material factual claims.

## II. <u>As a Permitted Use, the Project Does Not Require Conditional Use Approval</u>

Municipalities often divide their land into different zoning districts for land use regulation. In each zoning district, certain uses are allowed as a matter of right; although the DRB must review and approve these "permitted uses," these uses need only meet certain basic requirements. A municipality may choose to use an enhanced review for special uses which may be essential or desirable to a particular community, but which are not characterized as a permitted use within a zoning district. That process is called conditional use approval, and it requires a hearing as well as the consideration of additional criteria not applied to permitted uses. Additionally, municipalities can have "overlay zones" where particular rules and standards apply in addition to or in place of the rules and standards of the underlying zoning districts. Before considering the question of party status—which turns in part on whether Mr. Porter and Mr. Flinn can demonstrate a physical or environmental impact upon their interests <u>under the criteria reviewed</u>—we must first determine the type of review which the CDO requires.

In interpreting municipal regulations and bylaws, we must give effect to the intent of the relevant legislative body; to do this we turn first to the ordinary meaning of the plain language. See <u>Town of Killington v. State</u>, 172 Vt. 182, 188 (2001); <u>In re Vt. Nat'l Bank</u>, 157 Vt. 306, 312 (1991). If we cannot identify an ordinary meaning because the language is unclear or

4

ambiguous, or if applying the ordinary meaning makes the statute or bylaw ineffective or might appear to lead to irrational results, we seek other sources to help us ascertain the legislative intent. See In re Susan P, 169 Vt. 252, 262 (1999); Delta Psi Fraternity v. City of Burlington, 2008 VT 129, ¶ 7, 185 Vt. 129; Town of Killington, 172 Vt. at 189. Such sources may include the provision's subject matter, effects, and purpose as well as its context within the language of the larger bylaw. See Susan P, 169 Vt. at 262; Delta Psi Fraternity, 2008 VT ¶ 7; Town of Killington, 172 Vt. at 189. Additionally, we defer to an administrative agency's interpretation of ambiguous language in a statute or bylaw that the agency is responsible for administering, if the statute or bylaw is within the agency's area of expertise and there is no "compelling indication of error." In re Duncan, 155 Vt. 402, 408 (1990) (citations omitted). Ultimately, since land use regulation is in derogation of the common law, if the plain language of an ordinance is unclear, we generally resolve any ambiguity in favor of the landowner. In re Miserocchi, 170 Vt. 320, 324 (2000).

The CDO defines zoning districts in the City and provides a table listing permitted and conditional uses in each district. See CDO Appendix A: Comprehensive Use Table. Separately, the CDO provides definitions of the referenced uses. See CDO § 13: Definitions. The Project site is located in the Institutional Zoning District. In its current state, the athletic field might be characterized as falling under the following use category, which constitutes a permitted use in the Institutional District:

> **Recreational Facility – Outdoor**: An outdoor facility, without seating for spectators, and providing accommodations for a variety of individual or organized sports, including but not limited to basketball, field/ice hockey, soccer, lacrosse, baseball/softball, football, tennis, or golf. Such facility may also provide a snack bar, restaurant, and other support facilities. Said establishment may or may not include membership.

CDO § 13.

UVM maintains that the proposed improvements (open air bleachers, lights, a press box, bathrooms, locker rooms, a concession stand, paving, and landscaping) will not change the use of the property. Mr. Porter and Mr. Flinn contend that the improvements necessitate a change in use classification to "Recreational Facility – Outdoor Commercial," which requires conditional use review in the Institutional Zoning District. That use is defined as follows:

> **Recreational Facility – Outdoor Commercial**: An outdoor facility where tickets are sold or fees are collected from spectators and/or participants, with or

without seating for spectators, and providing accommodations for a variety of individual, organized, or franchised sports, including but not limited to basketball, field/ice hockey, soccer, lacrosse, baseball/softball, football or tennis. Such facility may also provide other regular organized or franchised events, snack bar, retail sales of related sports, health or fitness items, and other support facilities.

CDO § 13. Mr. Porter claims that "UVM will sell tickets and collect fees," and this, along with the addition of permanent seating, places the facility within the "Outdoor Commercial" category. (Mr. Porter's Mot. for Summ. J. at 2, filed Dec. 12, 2012.) Neither Mr. Porter, Mr. Flinn, nor UVM include evidence with their summary judgment motions indicating whether spectators at the Project's facilities will pay to watch games. Thus, we cannot determine on summary judgment whether the Project is best characterized as an "Outdoor" or "Outdoor Commercial" use.

The distinction, however, is ultimately not dispositive. In addition to being situated in the Institutional Zoning District, the Project also falls within the UVM South of Main Street Campus Overlay District (ICC-UVMS), in which "Schools – Post Secondary, and Schools – Community College shall be treated as permitted uses." CDO § 4.5.2(f)(7). UVM is clearly a post secondary school, which the CDO defines as a post-high school institution "including colleges, community colleges, universities, or continuing education." CDO § 13. Post secondary schools typically encompass a wide variety of inter-related uses, including classrooms, dormitories, offices, research facilities, and athletic facilities. Thus, because it falls within the category "Schools – Post Secondary," UVM's proposed athletic facility must be treated as a permitted use, even though, in the absence of the overlay zone, it may fall within a separate category that would require conditional use approval.

Because we appreciate Mr. Porter and Mr. Flinn's concern that this overlap of terms might appear ambiguous or lead to a strange result, we examine other sources that reveal legislative intent; these sources affirm our conclusion. First, we examine the greater context in which the provision appears. The purpose statement outlining the features of the ICC-UVMS overlay district states that this zone is meant:

to provide reasonable future use of the UVM residential and athletic campuses south of Main Street without further intrusion into the surrounding residential neighborhoods. This district allows for an increased development scale and intensity than would typically be found in the adjoining and underlying districts to support continued growth and expansion of the state's flagship academic institution.

6

CDO § 4.5.4(b)(4). Thus, the drafters of the CDO contemplated and even encouraged the expansion of athletic facilities in this particular zone. Indeed, the provision allows an increased development scale and intensity in order to support UVM's growth.

Additionally, we may look to an administrative agency's interpretation of ambiguous language in a statute or bylaw that the agency is responsible for administering, if the statute or bylaw is within the agency's area of expertise and there is no "compelling indication of error." In re Duncan, 155 Vt. 402, 408 (1990) (citations omitted). Here, Department of Planning and Zoning staff comments to the DRB, filed in this appeal, support the characterization of UVM's Project as a permitted rather than conditional use, and the City additionally asserts that this interpretation is consistent with prior applications of the core campus overlay districts. (See Exhibit 1, attached to UVM's Statement of Undisputed Material Facts, filed Jan. 14, 2013; City's Resp. to Mr. Porter's Mot. for Summ. J. at 2, filed Jan. 14, 2013.) These interpretations provide support for our conclusion that the athletic fields, as a component of a post secondary school, must be treated as a permitted use.

We fully appreciate Mr. Porter and Mr. Flinn's concern with the wide latitude that the CDO grants to UVM in utilizing the land comprising its campuses, but this Court does not have the authority—except in extraordinary circumstances—to stray from the language that the CDO's drafters created. Given the plain language of the provision treating post-secondary school uses as permitted uses, the provisions' place in the larger context of the CDO, the Department of Planning staff's interpretation, the City's interpretation, and our mandate to resolve any ambiguity in favor of the landowner (In re Miserocchi, 170 Vt. 320, 324 (2000)), we conclude that the Project is a permitted use in this zone and does not require conditional use approval.[3]

---

[3] Mr. Porter additionally argues that the Project should require major impact review (which, like conditional use review, requires additional considerations before the issuance of a permit) under CDO § 3.5.2(b). He fails, however, to provide any evidence as required by V.R.C.P. 56(c) that any of the conditions that would require such review exist, such as whether the project involves over 50 parking spaces or whether the applicant is responsible for multiple projects within any consecutive 12-month period within 1000 feet of the subject property. In any event, one category of development exempt from major impact review are those "that do not result in a change of use or increased parking demand as determined by the administrative officer." CDO § 3.5.3(d). In this case, the administrative officer determined that there would be no change in use, and that the project did not propose additional parking facilities or spaces. (See Exhibit 1, attached to UVM's Statement of Undisputed Material Facts, filed Jan. 14, 2013.)

### III. <u>Standing of Mr. Porter and Mr. Flinn</u>

This Court's jurisdiction is limited to "actual cases or controversies." <u>Parker v. Town of Milton</u>, 169 Vt. 74, 76–77 (1998); see also <u>In re Constitutionality of House Bill 88</u>, 151 Vt. 524, 529 (1949) ("The judicial power, as conferred by the Constitution of this State upon this Court, is the same as that given to the Federal Supreme Court by the United State Constitution; that is, the right to determine actual controversies arising between adverse litigants, duly instituted in courts of proper jurisdiction."). Whether a case or controversy exists turns partially on whether the party bringing a claim has standing to do so. <u>Parker</u>, 169 Vt. at 77. Standing is a "necessary component to the court's subject-matter jurisdiction." <u>Bischoff v. Bletz</u>, 2008 VT 15, ¶ 15, 183 Vt. 235. When parties lack standing, courts lack the authority to render decisions.

The starting point in analyzing whether a person has standing is to examine which issue or issues the parties' claims raise. Here, Mr. Porter and Mr. Flinn each make two types of claims. First, they make claims on behalf of others (and, in Mr. Flinn's case, on his own behalf) alleging insufficient notice under 24 V.S.A. § 4464. Second, they allege that the Project itself will affect their own interests.

#### a. Standing to raise claims of inadequate notice.

In the land use context, the Legislature has granted to certain classes of people the right to receive advance notice of hearings when municipal bodies consider particular types of development review applications. See 24 V.S.A. § 4464. Although Mr. Porter and Mr. Flinn allege that other parties did not receive adequate notice of the hearing at issue, Mr. Porter and Mr. Flinn lack standing to assert the rights of parties not involved in the appeal. See <u>Warth v. Seldin</u>, 422 U.S. 490, 499 (1975) (explaining that a litigant "cannot rest his claim to relief on the legal rights or interests of third parties."). Additionally, Mr. Flinn's personal claim of deficient notice fails, because, even viewing the facts as Mr. Flinn claims them to be,[4] Mr. Flinn has

---

[4] UVM argues that the Flinn property is not "adjoining" for purposes of 24 V.S.A. § 4464, which requires notice only to adjoining property owners. (Aff. of Lani Ravin at 3, filed Jan. 14, 2013). Mr. Flinn claims that his property "is adjacent to 308 S. Prospect St. which the University of Vermont is the listed owner. Seeing that 308 S. Prospect St. is the same owner as the owner of the land where the proposed development is to occur (450 acres parcel) and the properties are contiguous they are then affiliated." (Mr. Flinn's Reply to UVM's Opp. to Flinn's Mot. for Partial Summ. J. at 2, filed Jan. 17, 2013). Even if this is true, the mandate in 24 V.S.A. § 4464 to notify adjoining property owners has never been interpreted to extend to persons adjoining land owned by the same owner of the land proposed to be developed. Ultimately, however, we need not and do not decide whether Mr. Flinn's property is adjacent, because of his waiver of a notice violation claim.

waived the issue. Although he claims not to have received the formal notice of hearing that UVM sent to 240 other landowners, Mr. Flinn acknowledges that he received an email on May 2, 2012 inviting him to express comments or concerns in advance of the June 5, 2012 hearing in which he ultimately participated by submitting comments on May 8, 2012. (Mr. Flinn's Reply to City's Opp. to Flinn's Mot. for Partial Summ. J. at 2, filed Feb. 4, 2013). By participating in the proceeding and failing to articulate a cognizable injury stemming from the alleged notice violation, Mr. Flinn waived a claim of insufficient notice under the statutory notice requirements[5] of 24 V.S.A. § 4464 and substantially similar provisions within the CDO.

Moreover, even if Mr. Flinn had such a claim, the CDO states that defects or errors in notice "shall not invalidate an action of the DRB unless such error was the result of a deliberate or intentional act." CDO § 3.2.8(c); see also 24 V.S.A. § 4464(a)(5) (no defect of the form or substance of notice shall invalidate an action by an appropriate municipal panel if reasonable efforts were made to provide adequate posting and notice, and the content of the notice is not materially misleading). Mr. Flinn fails to offer any admissible evidence as required by V.R.C.P. 56(c) that would support a finding of a deliberate or intentional act or a materially misleading notice.

### b. Standing on claims related to impacts from the Project.

As to the claims alleging that the Project itself will affect Mr. Porter and Mr. Flinn's interests, state statutes set out the requirements for standing to appeal a municipal panel's decision. A person appealing a municipal panel's decision to this Court (as Mr. Porter has done) and a person wishing to participate in someone else's appeal (as Mr. Flinn wishes to do) must demonstrate that he or she participated in the proceeding below and qualifies as an "interested person" under one of the categories in 24 V.S.A. § 4465(b). See 10 V.S.A. § 8504; 24 V.S.A. § 4471. Participation consists of offering "oral or written testimony, evidence[,] or a statement of concern related to the subject of the proceeding." 24 V.S.A. § 4471(a). UVM does not dispute that Mr. Porter and Mr. Flinn participated in the DRB proceeding; thus, the only issue with respect to standing is whether they qualify as interested persons.[6]

---

[5] See In re Great Waters of Am., Inc., 140 Vt. 105 (1981) for a discussion of the distinction between constitutional due process notice requirements and statutory notice requirements in the land use context.

[6] Mr. Flinn argues that because certain entities, including opposing counsel, the DRB, and this Court, have used the term "interested person" in reference to Mr. Flinn, this proves that he possesses interested person status. Mr. Porter makes a similar argument, claiming interested person status in part because his

The statutory provision under which Mr. Porter and Mr. Flinn potentially qualify as interested persons requires that a person claiming such status (1) owns or occupies property in the "immediate neighborhood" of the subject property; (2) can "demonstrate a physical or environmental impact on his interest under the criteria reviewed"; and (3) "alleges that the decision or act, if confirmed, will not be in accord with the policies, purposes, or terms" of the CDO. See 24 V.S.A. § 4465(b)(3). Mr. Porter and Mr. Flinn meet the third element of the interested person test, as they allege that the Project as approved will violate certain provisions of the CDO. At issue is whether they meet the first two elements.

These first two elements are closely intertwined, because to interpret "immediate neighborhood," the Court examines both the physical proximity of the appellant's property to the project site, as well as whether the appellant potentially could be affected by aspects of the project which have been preserved for review on appeal. See In re Appeal of Stanak & Mulvaney, Docket No. 101-7-01 Vtec, slip op. at 1 (Vt. Envtl. Ct., Oct. 15, 2001) (Wright, J.). We determine whether an appellant lives in the "immediate neighborhood" on a case-by-case basis, examining the physical environment surrounding the project property and its nexus to the appellant and the appellant's property. See In re Bostwick Road Two-Lot Subdivision, Docket No. 211-10-15 Vtec, slip op. at 2–4 (Vt. Envtl. Ct. Feb. 24, 2006) (Durkin, J.), aff'd No. 2006-128 (Vt. 2007) (mem.). For example, the term "immediate neighborhood" for purposes of a project with far-reaching impacts such as a gravel pit could be a larger geographic area than for purposes of a one-bedroom accessory unit.

UVM argues that neither Mr. Porter nor Mr. Flinn are in the "immediate neighborhood" of the project, as their properties lie 1,705 feet and 1,930 feet, respectively, from the edge of the Project's athletic field. UVM also argues that the distance of these parcels from the Project in conjunction with the vegetation, buildings, and topography of the land in between precludes

property was one of those that UVM contacted when it notified 240 potentially interested parties. Regardless of descriptive terms that are often used during the initial stages of an action, when a person's alleged party status is challenged, this Court must conduct an analysis to determine whether the challenged individual meets the legal requirements for interested person status under the applicable statutory provisions. See Brod v. Agency of Natural Res., 2007 VT 87, ¶¶ 2, 9, 182 Vt. 234; V.R.E.C.P. 5(d)(2) (establishing that the receipt of a motion to dismiss a party triggers the Court's review of that party's standing). See also In re Hale Mountain Fish & Game Club for a discussion of the two ways that the term "interested person" applies to land use appeals. No. 190-11-10 Vtec, slip op. at 4 (Vt. Super. Ct. Envtl. Div. Aug. 25, 2011) (Durkin, J.)

the possibility of any physical or environmental impact on Mr. Porter and Mr. Flinn's interests that would entitle them to party status.

We find the Porter and Flinn properties to be in the immediate neighborhood of the Project for purposes of the statute. According to UVM's own estimates, these properties are less than half a mile from the athletic field at issue, where 3.8 million dollars of improvements will upgrade the field to add lighting fixtures on 70–80 foot high poles as well as bleacher seating and thousands of square feet of new impervious surfaces. Given the scope of the improvements and the potential that participants' and spectators' use of the facility could impact the surrounding area in various ways, we do not find it unreasonable to consider areas less than half a mile away as within the immediate neighborhood of the Project.

It is not enough, however, merely to own or occupy property in the immediate neighborhood of a project site. Even a person living mere inches from a project must still demonstrate a reasonable possibility of a "physical or environmental impact" on his or her interests under the criteria reviewed. To do so, the person must describe how the development under review will impact him or her specifically (i.e., describe a concrete and particularized injury) and must reference evidence showing that such impact is not hypothetical (i.e., demonstrate an actual or imminent injury). See In re Lowre Variance, Docket No. 19-2-11, slip op at 5 (Vt. Super. Ct. Envtl. Div. Oct. 31, 2011) (citing Agency of Natural Res. v. U.S. Fire Ins. Co., 173 Vt. 302, 306 (2001).

In this case, the "criteria reviewed" are those required for a Certificate of Appropriateness, Level II: the type of zoning permit necessary for this use. See CDO § 3.2.2(d). Thus, the Project must conform to the applicable district use and dimensional standards in CDO Article 4 (which include height restrictions), the parking requirements in CDO Article 8, and the applicable Land Division, Site Plan Review, and Architectural Review development standards in CDO Article 6 (which include parking and circulation). CDO § 3.2.2(e). Additionally, all development is subject to the citywide general regulations in CDO Article 5. Article 5 contains outdoor lighting provisions, including those specific to outdoor recreation facilities. CDO § 5.2.2(f)(8). Article 5 also requires all zoning permit applications to "demonstrate compliance with the applicable nuisance regulations and performance standards" of the Burlington Code of Ordinances. CDO § 5.5.1 The Burlington Code of Ordinances includes a noise ordinance. Thus, the City and UVM's contention that only conditional—and not permitted—uses implicate

noise considerations is incorrect. However, the Burlington Code of Ordinances specifically exempts "[m]usical, recreational and athletic events conducted by and on the site of a school or educational institution" from its provisions. City of Burlington Noise Control Ordinance § 21-13(c)(4). Thus, although review of a permitted use may often include noise considerations, for this particular project the "criteria reviewed" do not include noise impacts.

We now examine whether Mr. Porter and Mr. Flinn demonstrate an impact on their interests with regard to the criteria reviewed, including height restrictions, parking and circulation, and lighting of outdoor recreational facilities. In support of his contention that light from the athletic field will reach his property, Mr. Porter offers a photograph, marked as Exhibit 2 and labeled "Section 8 – 544 South Prospect Street," depicting cars, buildings, and four superimposed lines. Mr. Porter claims that UVM submitted the photograph with its application to the DRB, and that it "illustrates that two of the poles are at or above the tree line." (Porter's Response to UVM's Mot. for Summ. J. and Porter's Partial Mot. for Summ. J. at 2, filed Jan. 3, 2012.) He also includes a photograph of "the trees between the project location and [the Porter property]" which he characterizes as "sparse and unlikely to shield the lights." Id.

Although minimal, we find these statements to be sufficient to establish a non-speculative demonstration, or reasonable possibility, of a physical or environmental impact under criteria that must be reviewed for this Project. For a similar standing analysis in the context of Act 250 land use proceedings, see In re RCC Atlantic, Inc., No. 163-7-08 Vtec, slip op. at 8 (Vt. Envtl. Ct. May 8, 2009) (Durkin, J.) (litigants seeking party status "must at least state [that] their fears and concerns have some factual basis and are not based solely on speculation"); In re Goddard Coll. Conditional Use, No. 175-12-11 Vtec, slip op. at 2-3 (Vt. Super. Ct. Envtl. Div. Jul. 5, 2012) (Walsh, J.) (applying the Act 250 "reasonable possibility" test to the question of what an appellant must demonstrate to show standing in the context of an appeal from a municipal panel). Thus, we find that Mr. Porter has standing.

In contrast, Mr. Flinn does not explain within his filings how the Project might cause a physical or environmental impact to his interests under the criteria reviewed aside from an allegation that "associated impacts from the proposed development do physically and environmentally impact the occupants of [the Flinn residence] both directly and indirectly." (Mr. Flinn's Reply to UVM's Opp. to Mr. Flinn's Mot. for Partial Summ. J. at 2, filed Jan 17, 2013.) Statements that merely articulate a legal standard do not, in themselves, provide enough

12

factual information to demonstrate a possible physical or environmental impact entitling Mr. Flinn to interested person status. See In re Hartland Group, Docket No. 94-7-11 Vtec, slip op. at 2 (Nov. 1, 2011) (Durkin, J.). In its cross motion for summary judgment against Mr. Flinn, UVM pointed out this failure to demonstrate a physical or environmental impact. (UVM's Cross Mot. for Summ. J. at 2–3, filed Jan 17, 2013.) In his reply to UVM's motion, Mr. Flinn continued to fail to allege any physical or environmental impact to his property. (Reply to UVM's Opp. to Mr. Flinn's Mot. for Partial Summ. J. and Reply to UMV's Cross Mot. for Summ. J., filed Jan 17, 2013.)

The record before us, however, also includes the letter of concern that Mr. Flinn sent to the DRB in advance of the DRB hearing regarding the Project. (Exhibit 1 to City's Resp. to Mr. Flinn's Mot. for Partial Summ. J., filed Jan 29, 2013.) See V.R.C.P. 56(c)(3) (enabling the Court to consider other materials on the record in evaluating material facts alleged to be in dispute). In that letter, Mr. Flinn articulated potential impacts on his use of his residential property related to parking and circulation, factors that must be considered for permitted uses under CDO § 6.2.2(l) and CDO § 8. Specifically, the letter notes that the Project significantly increases the number of seats at the athletic facility and that traffic from spectators could impact the surrounding neighborhoods, including Mr. Flinn's neighborhood.[7] Based on Mr. Flinn's demonstration of a reasonable possibility of physical or environmental harm to his interests, we recognize his interested person status to participate in Mr. Porter's appeal.

## IV.    Whether the lights are "structures" that violate applicable height limitations

Mr. Porter's Question 1 asks whether the proposed 70–80 foot lights are "'buildings' as defined in Article 13 of the Burlington zoning ordinance." Article 13 contains no definition for the word "building," thus we cannot answer the question as posed. UVM appears to interpret Mr. Porter's Question 1 to ask whether the proposed lights are "structures,"[8] presumably because the citywide general regulations section in Article 5 of the CDO explains the calculation of "building height" by stating, "No structure shall exceed thirty-five (35) feet in height unless otherwise authorized under the district-specific provisions of Article 4." CDO § 5.2.6 (emphasis added). In light of the filings in this case and the language of the CDO, we understand Mr.

---

[7]  The letter also alleges potential noise impacts, but as the review in this case does not include noise impacts, Mr. Flinn does not have standing to challenge the Project on the basis of noise.

[8]   Specifically, UVM requests summary judgment on whether the lights are "'structures' subject to a 35 foot height requirement."

Porter's Question 1 to ask the legal question of whether the lights are "structures" under the CDO. If so, the parties also seek summary judgment on the legal question of whether 80-foot high light poles would violate height restrictions within the CDO, an inquiry encompassed by Mr. Porter's Question 4.[9]

As to standards under which we interpret municipal bylaws, we refer the reader to the discussion of relevant principals and case law in Section II of this decision.

We conclude as a matter of law that the athletic field lights are "structures" under the CDO. A "structure" is:

> Any construction, erection, assemblage or other combination of materials to form a construction that is stable, including but not limited to, buildings, stadiums, reviewing stands, platforms, stagings, observation towers, radio towers . . . footings or a foundation attachment to the land, and swimming pools necessitating pilings. The term "structure" shall be construed as if followed by the words: "or part thereof."

CDO § 13.1.2. Under the plain language of the definition, the 70–80 foot poles that UVM proposes are a "construction, erection, assemblage or other combination of materials" that forms a "construction that is stable." Thus, they are structures under the CDO. This interpretation is consistent with other sections of the CDO. For example, CDO § 3.1.2(a) requires a zoning permit for development including "exterior lighting" and "wireless telecommunications facilities, or other antennae." To suggest that a 70–80 foot pole for a light fixture is not a structure and therefore does not require review contravenes the requirement that exterior lighting receive a permit and otherwise defies common sense.

As to whether the lights violate height restrictions within the CDO, we must first determine which height restrictions apply. The lights are not subject to the general 35-foot restriction within Article 5, which applies unless different height limits are "authorized under the district-specific provisions of Article 4." CDO § 5.2.6. Here, the district-specific regulation in Article 4 applicable to the UVM South of Main Street Campus district controls, as that is where the Project is located. That provision states:

---

[9] Question 4 asks, "Do the proposed lights violate the building height restrictions in Sec. 4.5.2(d)(5) [Institutional Core Campus Overlay for UVM Central Campus]; Sec. 5.2.6; Sec. 6.0.1(f), (j), (k), (l), & (n)?" (Mr. Porter's Statement of Questions at 1, filed Oct. 17, 2012) (emphasis added). We presume that Mr. Porter meant to refer to CDO § 4.5.2(f)(5) [Institutional Core Campus Overlay for UVM South of Main Street Campus], as the Project is not within the Central Campus overlay, but rather within the South of Main Street Campus overlay.

14

> Building height shall be measured under the provisions of Art. 5.
>
> For the sole purpose of regulating building height, the ICC-UVMS District shall include an ICC-UVMS South of Main Street Campus Height Overlay as delineated on Map 4.5.2-6 below. Building height within the ICC-UVMS South of Main Street Campus Height Overlay shall not exceed 80-feet.
>
> For all other areas within the ICC-UVMS District, except for ornamental and symbolic architectural features, additions and new construction may be built to a height that does not exceed the actual height of the tallest existing structure as of January 1, 2008 and located within the ICC-UVMS District.

CDO § 4.5.2(f)(5) (emphasis added). UVM concedes that the athletic fields do not fall within the ICC-UVMS South of Main Street Campus Height Overlay district mentioned in the second sentence. Thus, the first and last sentences of the provision control.

Undisputed evidence on the record suggests that as of January 1, 2008, the actual height of the tallest existing structure within the ICC-UVMS District was the tallest of the University Heights buildings, with a building height of 62 feet and its peak at an elevation of 484 feet above sea level. (Aff. of Lani Ravin at 3, filed Dec. 3, 2012.) UVM argues that the term "actual height" does not reference the "building height" standards under the provisions of Article 5 (which generally measure height starting from ground level and ending at the top of the structure to be measured), but rather refers to a building's elevation above sea level. This interpretation lacks support within the CDO, which consistently refers to standard measurements from ground level, not measurements based upon sea level. See generally the tables in CDO § 4.4 and Appendix B. Moreover, other sections in the CDO specifically distinguish between "actual height" measurements and measurements based on elevation above sea level. See CDO § 4.5.2(d)(5). This distinction further supports the conclusion that "actual height" refers to standard foot measurements from ground level to a structure's tallest point. If the CDO's drafters had intended to instruct measurement from a point pertaining to sea level in the ICC-UVMS District, they could have chosen—but clearly did not choose—to do so.

Thus, the general height restrictions that apply in the area where the field is located limit structures to a height of 62 feet, as measured from ground level to the highest point of the structure. These limitations come from CDO § 5.2.6, read in conjunction with the district-specific height regulations in CDO § 4.5.2(f)(5).

This does not end our analysis, however, because UVM and the City argue that provisions in the CDO specific to the lighting of outdoor athletic fields override "any contrary general district height restriction that might otherwise apply." (UVM's Mot. for Summ. J. or

15

Partial Summ. J. at 9, filed Dec. 3, 2012.) The referenced provision is CDO § 5.5.2(f)(8), and it regulates the type of lighting fixtures and quality of light those fixtures emit in order to minimize the adverse light impacts such as glare, skyglow, and the unwanted illumination of nearby properties. For example, it requires that "[l]ighting for facilities designed for Class I and II levels of play (typically college, semi-professional, professional, or national levels) shall utilize luminaires with minimal uplight consistent with the illumination constraints of the design." CDO § 5.5.2(f)(8)(B). UVM argues that taller poles will be more effective than shorter poles at angling light downward toward the field, rather than onto adjoining properties and, thus, that "the specific outdoor recreational facility lighting objectives of [CDO §] 5.5.2[(f)](8) cannot be met if the [general] 35 foot height restriction is applied to outdoor lighting for recreational facilities." UVM does not state whether these objectives may be met under the applicable 62 foot height limit discussed above.

We decline at this time to rule as a matter of law whether CDO § 5.5.2(f)(8) requires the least intrusive lights possible *within applicable height restrictions*, or whether it allows *height restrictions to be exceeded* to provide for the least intrusive lights possible. We do not see anything within CDO § 5.5.2(f)(8) that explicitly exempts the lights proposed here from the applicable 62 foot height restrictions. We do see other portions of the CDO that impose specific height limitations for other particular uses, overriding normal height regulations. For example, CDO § 5.4.7(f)(2) regulates the height of telecommunications facilities, and CDO § 5.5.2(f)(1) imposes a maximum mounting height for light fixtures in parking lots. No specific height limits, however, are mentioned for outdoor recreational facility lighting. We also note that all outdoor lighting uses are subject to CDO § 5.5.2(a), which states: "Unless otherwise exempt by this Section, all outdoor light fixtures shall be subject to review and approval in conjunction with any land use and development permits under the requirements of Article 3 – Site Plan Review." Nonetheless, we do not reach a legal conclusion at this summary stage of this appeal on this issue because none of the parties have yet proven that they are entitled to judgment as a matter of law. See V.R.C.P. 56(a). For the same reason, we decline at this time to answer Mr. Porter's Question 4, which asks whether the proposed lights comply with CDO § 5.5.2(f)(8).

## Conclusion

For the reasons detailed above, this Court makes the following determinations.

We **GRANT** UVM's motion for summary judgment on whether Mr. Porter or Mr. Flinn have standing to raise concerns related to notice. We therefore **DISMISS** Mr. Porter's Question 9 regarding notice.

No evidence submitted in support of the summary judgment motions before us established a dispute of facts material on the question of whether the Project is a permitted use or would require major impact review or conditional use review. As a matter of law, we conclude that the project is a permitted use. This leads us to **GRANT** summary judgment in favor of UVM on Mr. Porter's Questions 2 and 3, which question whether the project requires major impact or conditional use review: the Project requires neither. Accordingly, we **DISMISS** Mr. Porter's Question 12, which asks whether the Project violates standards for major impact review or conditional use review, as neither are applicable. We **GRANT** summary judgment in part in favor of UVM and in part in favor of Mr. Porter on Mr. Porter's Question 6, which asks, "Is site plan and design review necessary in accordance with Sections 3.4; 3.5.2(a), 3.5.2(b)(5)&(8); and 5.5.2(a)?" Insofar as the Project requires general site plan review and outdoor lighting review, we answer the question in the affirmative as to CDO §§ 3.4 and 5.5.2(a), granting judgment in favor of Mr. Porter. Insofar as the Project does not require conditional use review, we answer the question in the negative as to CDO 3.5.2(a), 3.5.2(b)(5)&(8), granting judgment in favor of UVM that those provisions are inapplicable.

We **GRANT** summary judgment in favor of UVM on Mr. Porter's Question 7, which asks whether the Project complies with CDO § 5.5.1 regarding nuisance regulations, as we conclude that, as a school athletic facility, the Project is exempt from the City of Burlington Noise Ordinance.

We **GRANT** summary judgment in favor of Mr. Porter on Mr. Porter's Question 1, which asks whether the light fixtures are "structures"[10] as defined in the definitions section of the CDO: the lights are "structures" under the CDO.

As to Mr. Porter's Question 4, we conclude that the CDO § 5.2.6 as read in conjunction with CDO § 4.5.2(f)(5) imposes a height limit of 62 feet in the portion of the ICC-UVMS District in which the Project is located. However, we **DENY** summary judgment on whether the

---

[10] As noted above, Mr. Porter used the term "buildings" rather than "structures" in his question. We understand the question to pose the issue of whether the lights are "structures" that must comply with height restrictions, which is the issue that both UVM and the City fully briefed.

proposed lights violate that height limit or may be exempt from it, as no party has shown that it is entitled to judgment as a matter of law.

In light of our rulings in this decision, we understand the legal issues remaining for our consideration at trial are the following questions from Mr. Porter's Statement of Questions filed October 17, 2012: Questions 4, 5, 8, 10, 11, and 13.  As explained in our decision above, Mr. Porter and Mr. Flinn have standing to pursue this case under the criteria reviewed for the Project as a permitted use.  This matter has already been set for trial on April 9 and 10, with a final pre-trial conference on March 18.

Done at Berlin, Vermont this 26th day of February, 2013.


_____
Thomas G. Walsh, Environmental Judge